UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD HARTMAN, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 12-2085 |
| v. | : | |
| | | OPINION |
| GLOUCESTER TOWNSHIP, et al., | : | |
| Defendants. | : | |

This matter is before the Court on Motions of Defendants Ernest Basile, David Belcher, John Bullock, Gloucester Township, Gloucester Township Police Department, Joseph Kaighn, Timothy Kohlmeyer, Thomas Ritz, and John Stollsteimer [41] for Summary Judgment under Federal Rule of Civil Procedure 56 and of Plaintiff Ronald Hartman ("Hartman") [44] For Partial Summary Judgment as to Unconstitutional Entry/Search of Residence. The Court has considered the written submissions of the parties and the arguments advanced during the hearing in this matter on May 5, 2014. For the reasons expressed on the record that day, and those that follow, Defendants' Motion for Summary Judgment is denied in part and Plaintiff's Motion for Summary Judgment is denied.

## I.  Jurisdiction

This case is a civil action over which the district court has original jurisdiction based on a question "arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331.  Plaintiff Ronald Hartman asserts a violation of his civil rights pursuant to 42 U.S.C. § 1983. In addition, the preamble of the Complaint states that the matter is being brought under the Civil Rights Act of 1871,  and 42 U.S.C. §§

1

1983, 1985, 1986 and 1988. With respect to Plaintiff's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## II. Background

This case is related to <u>Patrice Sadowski v. Gloucester Twp., et al.</u>, Civil Action Number 12-2083, which is currently pending before this Court.  Hartman's Complaint consists of three counts: Count I Unlawful Seizure/ Unlawful Arrest, Malicious Prosecution, Abuse of Process, Excessive Force, Unlawful Entry/ Search, Failure to Supervise, and other <u>Monell</u> violations in violation of  42 U.S.C. § 1983 and the New Jersey Constitution; Count II violations of 42 U.S.C. §§ 1983 and 1986 for Defendants' refusal to prevent an unconstitutional act and; Count III violations of 42 U.S.C. §§ 1983 and 1985 conspiracy to conceal unconstitutional conduct.

The Court will largely incorporate the background section of its Opinion in Sadowski's case because the facts leading up to Hartman's arrest are relevant to the pending motions.  Patrice Sadowski ("Sadowski") and Hartman were working from Hartman's home on April 9, 2010.  Both were employees of the United States Department of the Treasury in the Internal Revenue Service Division and were permitted to telecommute, i.e., perform their job duties from a location outside the office.  Hartman resides in Gloucester Township, New Jersey and began working for the Internal Revenue Service in January, 1972.

On April 9, 2010, the Gloucester Township Police claim that a 911 call was generated from the Hartman Residence and that the caller "hung up."  This type of 911 call is also referred to as an "abandoned" 911 call.  The Township's protocol requires that a police officer be dispatched to the residence to investigate whether the call was made

in error or by someone in need. As a result, Gloucester Township Police Officer David Belcher ("Belcher") went to the Hartman residence and knocked on the door.

What happens next is in dispute.  The version of events recounted by both Sadowski and Hartman differ from Belcher's version, and later on, from the version of events recounted by the other responding officers.  In general terms, Officer Belcher claims that when he responded to the Hartman residence, Hartman acted suspiciously, would not let him enter the house, gave vague answers to his investigatory questions, and insisted that Belcher obtain a warrant to enter the house.  Because an abandoned 911 call was generated from Hartman's residence, Belcher contends that he was trying to ascertain whether the call came from someone in need inside of the residence.  After he met Hartman, he claims the circumstances were suspicious and called for backup out of concern that something was wrong.  Eventually, the police entered the house and arrested Hartman. Here, both parties move for summary judgment, however, Hartman's motion is only as to the narrow claim of whether the warrantless entry into his home is unconstitutional. Following are the facts viewed in a light most favorable to Hartman. The facts viewed in a light most favorable to Defendants are recounted in the analysis of Hartman's motion.

Hartman and Sadowski were working in separate areas of the house on the morning of April 9, 2010.  They were alone and both deny placing a 911 call, errantly or for any need of assistance.  Sadowski Dep. at 29:6-8; Hartman Dep. at 45:2-4. Hartman contends that he and Sadowski were working independently and that they had very little communication prior to Belcher's arrival. Hartman Dep. 44:10-13. Belcher arrived at the Hartman residence and agrees that, from the outside of the house, he did not see or hear any signs of distress or anything indicating an emergency.  Belcher Dep. at 24:22-22:4.

3

Belcher knocked on the front door and Hartman answered.[1] Significantly, Sadowski testifies that she accompanied Hartman to the front door to speak with Belcher. Sadowski Dep. 31:9-13.  Hartman also testifies that Sadowski accompanied him to the door.  Hartman Dep. at 50:16-19, 51:9-22.

According to both Sadowski and Hartman, the door was open and Belcher had an unobstructed view of both Hartman and Sadowski.[2] They assured Belcher that all was well and that they did not call 911. Sadowski Dep. at 35:12-36:1; Hartman Dep. at 50:20-51:8.  Belcher was speaking in a raised voice and demanding to enter the home. Sadowski Dep. at 31:17-21, 32:23-32:7; Hartman Dep. at 51:23-52:7, 52:15-20, 52:8-23. Both Sadowski and Hartman characterize Belcher as belligerent and claim that he screamed at them, saying multiple times that he can enter any house anytime.  Id.

No one disputes that Hartman was insistent that Belcher not enter the house without a warrant.  Belcher then asked Hartman for identification, and Hartman went upstairs to get his federal identification and his wallet.  Hartman Dep. at 55:19-23, 56:8-57:10, 54:24-55:10.  In the meantime, Sadowski and Belcher spoke at the door. Sadowski claims that Belcher requested entry and stated that he needed to check the house for dead bodies. Sadowski Dep. at 34:12-16.  Belcher was trying to gain entry into the house "for a community caretaking issue" and believed that he "had every right to enter [the] house whether or not [Hartman] let [him] or not." Belcher Dep. at 49:8-23. As Hartman was coming back to the door, Sadowski claims that Belcher said "well, okay then" and walked away.  Sadowski Dep. at 34:24-35:11.  At this point Sadowski believed

---

[1] Hartman's front door has an outside lock and an interior lock; both must be opened with a key.  Therefore, when Hartman answered the door, he had to use a key from the inside to unlock the door.
[2] Belcher testifies that only Hartman answered the door, and opened the door approximately 2-4 inches. Belcher Dep. at 28:16-20.  According to Belcher, he asked if anyone else was home and Hartman told him it was none of Belcher's business. Id. at 31:1-7.

Belcher was gone and the "incident" was over; she and Hartman resumed working. Id. at 38:1-17; Hartman Dep. at 58:23-59:7.

Belcher then radioed for backup and states that at this point in time, he had already made the decision to enter the house. Belcher Dep. 78:8-11, 75:3-15.15.  All of the police officers agree that upon arrival on the scene of Hartman's house, there were no outward signs of an emergency. See Bullock Dep. at 16:12-16, 17:24-18; Stollsteimer Dep. 29:11-14, 29:15-18; Kohlmyer Dep. 21:1-20; Ritz Dep. 14:24-15:10; Basile Dep. 25:23-26:8, 29:4-16; Kaighn Dep. 26:16-27:14.  Officers Kaighn and Basile were able to see Hartman through a window and reported that nothing was going on in the house from their vantage point.  Belcher Dep. 99:14-100:8.  Approximately ten minutes later, the residence telephone rang and was answered by Sadowski.  Sadowski Dep. at 39:17-40:2; Hartman Dep. at 60:11-22.  The call was from a Gloucester Township Police Officer asking Sadowski to come outside with her keys.  Sadowski Dep. at 40:4-9. Sadowski exited the residence through the back sliding glass doors and claims that, as she proceeded to the front of the house, she was met by Gloucester Township Police Officer John Stollsteimer ("Stollsteimer") in "full assault stance" with his weapon drawn and pointed at Sadowski's face.  Sadowski Dep. at 40:14-19, 42:24-43:6.  Sadowski claims that the weapon was pointed at her for almost fifteen seconds. Id. at 76:7-77:12. Sadowski, who was confused, said "what in God's name are you doing?"  Id. at 41:7-11. Stollsteimer laughed and said "yeah, right, what am I doing." Id. at 41:13-14.  Sadowski was then escorted to the front of the house where she encountered another police officer and Belcher.  Id.

By this time there were several officers on the scene.  Sadowski was "peppered with questions" about who else was in the house, who owned the cars in the driveway,

who they worked for, what they were doing, etc. Id.  Sadowski answered their questions and assured them that there were no weapons in the house and that nothing was wrong. Id. at 41:15-42, 42:3-10.  According to Belcher, she admitted that she accidentally dialed 911. Belcher Dep. 92:13-93:7, 95:5-13.  At this point, the record is unclear as to the nature of the officers' concern.  If domestic violence was suspected, Sadowski was now safely out of the house.

Defendants claim that after Sadowski exited the house, she told them that Hartman was acting strange which caused Hartman's wellbeing to become a concern. However, Sadowski denies making such a statement.  Although you can hear an officer on the radio telling dispatch that Sadowski said Hartman was irrational, you never hear Sadowski's voice on the radio.  Def. Exs. L and O (dispatch call and transcript). Throughout her interaction with the police, Sadowski claims that she told them repeatedly that nothing was wrong, that there were no weapons in the house, and that it was unnecessary for the officers to enter the house. Id. at 43:6-16, 46:17-23.

Then the Officers asked Sadowski if she had a key to the residence and she replied yes; the large key ring was hanging by her side.  She claims that one of the officers took the keys to Hartman's residence without her consent and directed her to stand in one spot. Id. at 46:24-47.  She was prohibited from approaching the door to coax Hartman outside; she claims Hartman would have come outside at her insistence. Other officers continued to arrive on the scene, including Kohlmyer who arrived with a Pepperball Launching System. Kohlmyer Dep. 12:10-22, 13:9-22.

Sadowski describes being told to stand "right there" and that she was surrounded by the police officers.  Id. at 80:17-81:9.  She claims that she was not free to leave. Despite her protests ("What in God's name are you doing"), she claims the officers were

laughing and acting cavalier.  The officers, Bullock, Kohlmyer, Stollsteimer, Ritz and

Belcher devised a plan to enter the house.  Kohlmyer prepared the Pepperball

Launching System and Ritz lined up with a ballistic shield.  Kohlmyer Dep. 15:19-16:19,

Stollsteimer Dep. 65:6-24.  Stollsteimer had his gun drawn and was in front of Belcher.

Belcher Dep. 114:1-2.

       Stollsteimer agrees that as they began to approach to door, there were no signs or

sounds of an emergency and the officers did not suspect any criminal activity.

Stollsteimer Dep. 70:15-71:11-24.  Belcher testified that the officers were going to enter

the home at this point regardless of what happened at the door. Belcher Dep. 103:24-

104:8.  Hartman contends that the officers were kicking the door and that he was able to

make this determination by observing the force of the door as it was moving.  He yelled

for them to stop and indicated that if the door was broken, he would sue the police

officers.  Hartman Dep. at 68:10-15.  Hartman was trying to unlock the door with the

inside key and tried to jiggle the handle, to open the finicky door.  Id. at 70:9-18, 71:1-

72:1.  The officers asked him to stop holding the door knob and he complied.  Id. at 73:9-

13.

       Then the officers rushed through the door, knocking Hartman all the way into the

kitchen.  Id. at 74:1-10.  Hartman states that Officer Ritz fell on top of him and the

ballistic shield wielded by Ritz was between their bodies.  Id. at 42:9-43:2. Almost

immediately, Hartman was pepper sprayed. Id. at 75:13-16.  He testifies that he was

kicked in the face by Officer Ritz. Id. at 80:4-17, 81:16-21.  He tried to shield himself and

claims that as he was being handcuffed, Kohlmyer pepper sprayed him again. Id. at

79:5-16.

       Hartman was escorted out of the house and taken to the police station. There, he

was charged with resisting arrest, aggravated assault on a police officer and obstruction. The basis for the aggravated assault charge was an injury to Kohlmyer, who testified that during the entry into the residence, he fell and injured his hand and shoulder. Kohlmyer Dep. 40:10-15, 42:13-20, Ex. F 65:4-68:6; Summons, Ex. M.  Kohlmyer does not indicate that he was pushed by Hartman.  The resisting arrest charge stems from Hartman's alleged flailing and struggling during the arrest. Belcher Dep. 146:14-19.  All of the charges were dropped.  Hartman Dep. 99:5-106:22.

For the reasons that follow, Defendants' Motion for Summary Judgment is denied in part. Hartman's Motion for Partial Summary Judgment is denied.

### III. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(a).  The Court will enter summary judgment in favor of a movant who shows that he is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether

8

a genuine issue of material fact exists, the Court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility

determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N.
Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. Discussion

Defendants move for summary judgment on the following grounds.[3]  As to
Hartman's claims under 42 U.S.C. § 1983, Defendants argue that summary judgment is
warranted on Hartman's claims of illegal search and seizure and excessive force in
violation of the Fourth Amendment, as well as on Hartman's claim of  unlawful seizure,
false arrest, and malicious.  Defendants also invoke the defense of qualified immunity.
In addition, Defendants Gloucester Township and the Gloucester Township Police
Department argue that summary judgment is warranted as to Hartman's Monell claim.
Finally, Defendants argue that summary judgment is warranted as to Hartman's claims
under 42 U.S.C. § 1983, and § 1986, Hartman's claims of conspiracy and violations of
the New Jersey Constitution.

Hartman moves for partial summary judgment on the ground that the
warrantless entry into his home violates the Fourth Amendment.  Because Hartman's
motion is related to Defendants' arguments in favor of summary judgment on the same
issue, both motions will be considered together.  The Court will address the issues in
turn.

### A. 42 U.S.C. § 1983 and Qualified Immunity

#### 1. Standard of Review

Plaintiff's constitutional claims are governed by Title 42 U.S.C. § 1983, which
provides a civil remedy against any person who, under color of state law, deprives

---

[3]  Defendants brief does not distinguish the claims as to each of the individual officers. Instead, the claims are
addressed in a manner that lumps Defendants together.  The Court will address the claims as set for in the
Defendants brief without respect to each officer.

another of rights protected by the United States Constitution.  See Collins v. City of

Harker Heights, 503 U.S. 115, 120 (1992). Any analysis of 42 U.S.C. § 1983 should begin

with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress.

42 U.S.C. § 1983.  As the above language makes clear, Section 1983 is a remedial statute

designed to redress deprivations of rights secured by the Constitution and its

subordinate federal laws.  See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).  By its

own words, therefore, Section 1983 "does not . . . create substantive rights."  Kaucher v.

County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a

"deprivation of a constitutional right and that the constitutional deprivation was caused

by a person acting under the color of state law."  Phillips v. County of Allegheny, 515

F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir.

1996)).  Thus, a plaintiff must demonstrate two essential elements to maintain a claim

under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the

Constitution or the laws of the United States" and (2) that the plaintiff was deprived of

his rights by a person acting under the color of state law.  Williams v. Borough of West

Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

A similar analysis may be made regarding any claim under the New Jersey Civil

Rights Act.  See Armstrong v. Sherman, No. 09 CV 716, 2010 WL 2483911, *5 (D.N.J.

Jun. 4, 2010) ("[T]he language of the New Jersey Civil Rights Act, like the language of

42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated.")[4]

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly

---

[4]  For this reason, the Court will not undertake separate analysis of Hartman's claims under the New Jersey Civil Rights Act. "This district has repeatedly interpreted NJCRA analogously to § 1983." Pettit v. New Jersey, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011). "[W]hen pled together, [the NJCRA and § 1983] are analyzed under the same standard[.]" Id., 2011 WL 1325614 at *4; see also Hottenstein v. Sea Isle City, 793 F.Supp.2d 688, 695 (D.N.J. 2011).

incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Couden, 446 F.3d at 492 (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley, 475 U.S. at 341 (1986). See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.) Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

## 2. Discussion

As a preliminary matter, a Municipal Police Department is not a proper defendant in a case under 42 U.S.C. § 1983. Padilla v. Township of Cherry Hill, 110 Fed. App'x 272, 278 (3d Cir. 2004). For this reason, Defendant Gloucester Township Police Department is dismissed from the action.

In addition, there is no dispute that the police officers were acting under color of law. The issues in dispute are whether the officers' entry into Hartman's home and his eventual arrest violated his Fourth Amendment rights. There is also a dispute as to

whether such a right was clearly established at the time of the incident on April 9, 2010. The issues are germane to both Hartman's and Defendants' motions for summary judgment.

### a. Hartman's Claim of Illegal Search and Seizure

### 1. Defendants' Motion

Plaintiff states a claim under the Fourth Amendment pursuant to 42 U.S.C. §1983. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S. Const. Amdt. 4.

"One's home is sacrosanct, and unreasonable government intrusion into the home is 'the chief evil against which the wording of the Fourth Amendment is directed.'" United States v. Zimmerman, 277 F.3d 426, 431–432 (3d Cir. 2002) (citing Payton v. New York, 445 U.S. 573, 585 (1980)). In general, a warrantless entry into a person's house is unreasonable per se. United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (citation omitted). Exceptions to this rule include consent or probable cause accompanied with exigent circumstances which justify the intrusion. United States v. Coles, 437 F.3d 361, 365–366 (3d Cir. 2006) (citing Steagald v. United States, 451 U.S. 204, 211 (1981)).

Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. Coles, 437 F.3d at 366. "[I]n the absence of

14

exigent circumstances the warrantless entry of a private dwelling place for the purpose of making an arrest is unlawful." United States v. Williams, 612 F.2d 735, 738 (3d Cir. 1979); see also Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) ("When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness [that attaches to all warrantless home entries] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.")  Even where criminal activity is not afoot, exigent circumstances permit warrantless entry into a home where a police officer reasonably believes that "someone is in imminent danger." Parkhurst v. Trapp, 77 F.3d 707, 711 (3d Cir. 1996);.

Where it is believed that someone is in need, police officers can also make warrantless entry into a home.  Mincy v. Arizona, 437 U.S. 385, 392-393 (1978).  The community caretaking exception was first recognized by the Supreme Court in Cady v. Dombrowski, 413 U.S. 433, 439 (1973).  "In performing this community caretaking role, police are 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety.'" United States v. Smith, 522 F.3d 305, 313 (3d Cir. 2008) (quoting United States v. Rodriguez–Morales, 929 F.2d 780, 784–85 (1st Cir. 1991)). It is a parallel function to the police officers duty to law enforcement.  Thus, the community caretaking function permits the police limited access without a warrant to motor vehicles and, at one time homes, to ensure the wellbeing of the community. See Ray v. Twp. of Warren, 626 F.3d 170, 177-78 (3d Cir. 2010) (holding that prior to November

2010, the law governing whether the "community caretaking" function justified warrantless entry into the home was not clearly established).

The New Jersey Supreme Court defined the parameters of the community caretaking function as follows:

> The community-caretaking doctrine recognizes that police officers provide "a wide range of social services" outside of their traditional law enforcement and criminal investigatory roles. Bogan, supra, 200 N.J. at 73, 975 A.2d 377; see also Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714−15 (1973). These social-welfare activities include, among other things, protecting the vulnerable from harm and preserving property. Bogan, supra, 200 N.J. at 73, 975 A.2d 377. In performing these tasks, typically, there is not time to acquire a warrant when emergent circumstances arise and an immediate search is required to preserve life or property. This narrow exception to the warrant requirement has been applied to such circumstances as allowing the police to conduct a warrantless search of a car to locate a gun that was missing from a police officer, Cady, supra, 413 U.S. at 435−37, 442−43, 93 S.Ct. at 2525−26, 2528−29, 37 L.Ed.2d at 711−12, 715−16, to perform a "welfare check" of a vehicle that was parked in an area known for suicides and whose last authorized driver was listed as a missing person, State v. Diloreto, 180 N.J. 264, 270, 280−82, 850 A.2d 1226 (2004), and to set foot in an apartment to ascertain the welfare of a child who was home from school, with no apparent excuse, in a residence that had been the site of an alleged sexual assault earlier that day, Bogan, supra, 200 N.J. at 65, 975 A.2d 377. The community-caretaking functions in these cases were permissible without a warrant because they were "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." See Cady, supra, 413 U.S. at 441.

State v. Edmonds,  211 N.J. 117, 141 (2012).

However, the community-caretaking doctrine is "not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances." Edmonds, 211 N.J. at 143.

Here, viewing the facts in a light most favorable to Hartman, there is a question

of fact related to whether Hartman's rights have been violated. Hartman and Sadowski were responsive to Belcher's inquiry about the abandoned 911 call and assured him that nothing was wrong.  With the exception of demanding that Belcher get a warrant to enter his home, Hartman was cooperative.  There is no evidence suggesting that any criminal activity was afoot. See Belcher Dep. 71:17-24; Stollsteimer Dep. 70:15-71:11-24.

Moreover, Belcher and the responding officers did not sense any emergency situation from the outside of the home or when they had Hartman in view through the windows. See Bullock Dep. at 16:12-16, 17:24-18; Stollsteimer Dep. 29:11-14, 29:15-18; Kohlmyer Dep. 21:1-20; Ritz Dep. 14:24-15:10; Basile Dep. 25:23-26:8, 29:4-16; Kaighn Dep. 26:16-27:14. In addition, given Belcher's testimony that he made the decision to enter the home upon Hartman's insistence that he get a warrant, a question of fact looms as to whether an objectively reasonable officer would believe that someone was in need. See, e.g., United States v. Barone, 330 F.2d 543, 544 (2d Cir. 1964) (police officers responding to abandoned 911 call heard screams coming from the house); People v. Greene, 289 Ill.App.3d 796, 799, 682 N.E.2d 354 (1997) (entry permitted under community caretaking exception where after 911 call hang-up, an individual reluctantly answered the door, was high, and the home smelled like marijuana); see also Belcher Dep. 78:8-11, 75:3-15.15.

As the incident progressed, the nature of the situation changed.  Belcher testified that he decided to enter the home after Hartman insisted on a warrant and in Belcher's opinion, was acting suspiciously.[5]  Then, Belcher claims that it was a possible domestic

---

[5] An abandoned 911 call standing alone is not enough to justify entry into a home, although it may contribute to the suspiciousness of the circumstances. See State v. Frankel, 179 N.J. 586, 608-09  (2004) ("A 9–1–1 call is tantamount to a distress call even when there is no verbal communication over the telephone to describe the nature of the emergency. The responding police officer is not required to accept blindly the explanation for the 9–1–1 call offered by the resident answering the door, but must base his decision on the totality of the circumstances."); see

violence situation. Belcher Dep. at 94. Once Sadowski was out of the house, he claims the situation morphed into a community caretaking function, with concern for Hartman's wellbeing.  On one of these bases, the police officers entered the house.

There is a question of fact as to whether the requisite exigent circumstances existed to permit Defendants' warrantless entry into Hartman's home. <u>Williams</u>, 612 F.2d at 738.  Viewing the facts in a light most favorable to Hartman, there was no suspicion of criminal activity.  In addition, to the extent domestic violence was an issue, when Sadowski exited Hartman's residence her safety was no longer in question. Moreover, Sadowski assured them that nothing was wrong.  Finally, there are questions of fact precluding summary judgment as to whether the community caretaking function justified entry into the home.  The officers testified that they could see Hartman through a window and that Hartman was sitting at the kitchen table.  Thus, Hartman's wellbeing was viewable and there is no testimony that the officers viewed Hartman attempting to injure himself.

Although Sadowski denies stating that Hartman was acting "irrational," even if she made such a statement, viewing the facts in a light most favorable to Hartman, there is a question of fact as to context of the word "irrational" as sufficient to trigger the community caretaking exception.  "Irrational" can mean many things, and does not necessarily send a message that Hartman was considering harming himself, as Belcher states was the justification for entering the home.  And Sadowski testifies that she assured the police officers that everything was fine.

---

also <u>United States v. Prescott</u>, 581 F.2d 1343, 1350 (9th Cir. 1978) (refusal to consent to entry and search "cannot be a crime" and "cannot be evidence of a crime.").

Because the underlying circumstances faced by Belcher and the other officers are unsettled, the Court cannot undertake an analysis of whether entry into Hartman's home was objectively reasonable and justified warrantless entry. Under the circumstances of this case, it is debatable whether the officers confronted exigent circumstances and/or whether the circumstances permitted warrantless entry into the home under the community caretaker exception. At the time of the incident in April 2010, whether the "community caretaking" exception to a warrantless search is appropriate required an objective consideration of the totality of the circumstances. Frankel, 179 N.J. 586. Thus, the law in New Jersey at the time of the arrest required an officer invoking community caretaker exception to consider the totality of the circumstances as set forth in the New Jersey Supreme Court's decision in Frankel. 179 N.J. 586. (2004).  Id. (citing cases); see also Edmonds, 211 N.J. 117.

Here, there are significant questions of fact precluding an analysis of whether the officers' actions were objectively reasonable under the circumstances because the underlying circumstances are disputed.  Thus, under the present record, Defendants' Motion for Summary Judgment is denied as to the illegal search and seizure claim.

## 2. Qualified Immunity

For the same reasons, qualified immunity cannot be extended to the police officers at this time.  Defendants argue that the right to be free from entry of a home under the community caretaking function was not clearly established in April, 2010. Ray v. Twp. Of Warren was decided on November 23, 2010 (after Hartman's arrest) and held that:

> The community caretaking doctrine cannot be used to justify warrantless searches of a home. Whether that exception can ever apply outside the context of an automobile search, we need not now decide. It is enough to say that, in the context of a search of a home, it does not override the warrant requirement of the Fourth Amendment or the carefully crafted and well-recognized exceptions to that requirement.

Ray, 626 F.3d at 177.

Until Ray, the question of whether the community caretaking doctrine could justify a warrantless entry into a home was unanswered in our Circuit; on that basis the Ray police officer defendants were entitled to qualified immunity because it would not have been apparent to an objectively reasonable officer that entry into Ray's home on June 17, 2005 was a violation of the law.  While Ray resolved the question of whether the community caretaking exception applied to searches of the home, it is not dispositive here.

Although Belcher and the other officers may have had a mistaken belief as to whether or not they could enter the home under the community caretaking exception, application of the exception still requires an evaluation of the totality of the circumstances.  And an assertion of a constitutional right to privacy cannot be evidence of wrongdoing or used as justification for warrantless entry. Frankel, 179 N.J. at 611 (citing United States v. Alexander, 835 F.2d 1406, 1409, n.3 (11th Cir. 1988)).

Thus, even if the police officers believed they could enter the home under the exception, because Hartman's right was not clearly established, there are questions of facts related to whether the circumstances justified warrantless entry into Hartman's residence pursuant to the community caretaking exception. See State v. Reece, 2013 WL 4525600 (N.J. Super. App. Div. Aug, 28, 2013) ("In the absence of facts triggering the

emergency aid doctrine, which would make police entry lawful, defendant's refusal to allow [the police] to enter his home was not an act of obstructing. He was entitled to refuse to cooperate.")  As a result, the Court cannot evaluate whether the police officer's actions were objectively reasonable under the present record, and Defendants' Motion for Summary Judgment is denied on this basis. Frankel,179 N.J. at 572; see also Owens v. City of Atlantic City, 2008 WL 4205797, *9 (D.N.J. 2008) (citing Curley v. Klem, 499 F.3d 199, 211, n. 12 (3d Cir. 2007)) (explaining, "[e]ven though the determination of whether an officer made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury, the Third Circuit has recognized that a judge could decide the objective reasonableness issue once all the historical facts are no longer in dispute.").

### 3. Hartman's Motion for Partial Summary Judgment

Likewise, Hartman's Motion for Partial Summary Judgment is also denied. There are questions of fact precluding an assessment of what officer Belcher faced when he spoke to Hartman at the door, what Belcher observed, and the officers' interaction with, assessment of, and communication with Sadowski after she exited the house. "The police officer is at the door [and] cannot know what type of emergency, if any, lies inside—all he knows is that the caller has dialed an emergency response number.  In light of the presumptive emergency, we cannot conclude that the officer is bound to ignore the warning and walk away." Frankel, 179 N.J. at 611.

Thus, viewing the facts in a light most favorable to the Defendants, a reasonable jury could conclude that entering the house under the totality of the circumstances, as

required for the community caretaking exception to the Fourth Amendment, was objectively reasonable and did not violate Hartman's Fourth Amendment rights.  <u>Mincy</u>, 437 U.S. at 392-93 (warrantless entry permitted where officers believe someone is in immediate need of aid.)  For these reasons, Hartman's Motion for Partial Summary Judgment is denied.

### b. Hartman's Excessive Force Claim

Summary judgment is denied as to Hartman's excessive force claim because there are genuine issues of fact related to the circumstances confronted by the officers and as to whether the officers' actions were objectively reasonable.  A Fourth Amendment excessive force claim calls for an evaluation of whether police officers' actions are objectively reasonable in light of the facts and circumstances confronting him. <u>Graham v. Conner</u>, 490 U.S. 386, 397 (1989). While the question of reasonableness is objective, the Court may consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. <u>Id.</u> Furthermore, appropriate attention should be given "to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" <u>Groman</u>, 47 F.3d at 634 (quoting <u>Graham</u>, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary," violates the constitution.)).

Here, the police officers did not suspect any criminal activity and there is a question of fact as to whether Hartman posed an immediate threat to the safety of the officers or others.  Viewing the facts in a light favorable to Hartman, he was cooperative, but would not let the police enter his home; Sadowski corroborates Hartman's account.

Likewise there is a question of fact as to whether Hartman was actively resisting arrest or attempting to evade arrest.  Id.  Both Sadowski and Hartman say the officers used pepper spray and kicked him in the face several times. Even if it appeared to the officers that Hartman was resisting arrest, under the circumstances viewed through Hartman's lens, Hartman was not a threat and the use of pepper spray and kicking him in the face may not be reasonable. As a result, Defendants' Motion for Summary Judgment is denied as to this claim.

### c. Hartman's Unlawful Arrest Claim

Summary judgment is denied as to Hartman's claim of unlawful arrest.  To prove a claim for unlawful arrest, Plaintiff must show that he was arrested without probable cause. Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997). Probable cause exists where "'the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Schneider v. Simonini, 163 N.J. 336, 349 (2000) (citing Brinegar v. United States, 338 U.S. 160, 175–76, (1949)). Probable cause is less than the proof needed to convict, but more than mere suspicion. Id. A police officer can defend a § 1983 claim by establishing: (1) that he or she acted with probable cause; or, (2) if probable cause did not exist, that a reasonable police officer could have believed it existed. Kirk v. City of Newark, 109 N.J. 173, 185 (1988) (citing Anderson, 483 U.S. at 663–64).

The existence of probable cause is generally a factual issue for the jury. Groman, 47 F.3d at 635. However, a district court may determine that probable cause existed "as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not

support a contrary factual finding, and may enter summary judgment accordingly."

Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003) (citations omitted).

Hartman argues that there was no probable cause to arrest him because he was cooperative and Sadowski corroborates Hartman's account. Given the dispute of facts as to the circumstances for the arrest, summary judgment is denied.

### d. Hartman's Malicious Prosecution Claim

Summary judgment is denied as to Hartman's claim of malicious prosecution. To establish malicious prosecution under § 1983, a plaintiff must establish that: (1) the defendant initiated a criminal proceeding; (2) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding; (3) the criminal prosecution resulted in plaintiff's favor; (4) the proceeding was initiated without probable cause; and (5) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice. DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005); Santiago v. City of Vineland, 107 F. Supp. 2d 512, 566 (D.N.J. 2000). Defendants challenge only the fourth and fifth elements of the analysis. As stated previously, there are genuine issues of material fact precluding summary judgment on the existence of probable clause.

As to malice, the Court looks to the law of the forum state for guidance. Lippay v. Christos, 966 F.2d 1490, 1502 (3d Cir. 1993) (citing cases). "Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." Morales v. Busbee, 972 F. Supp. 254, 261 (D.N.J. 1997) (citations omitted). "Historically . . . the less evidence of probable cause there is, the more likely it

is that the original plaintiff was motivated by an impermissible, malicious intent. We have therefore recognized that proof of probable cause may be relevant to proof of malice." LoBiondo v. Schwartz, 199 N.J. 62, 94 (2009); see also Westhoff v. Kerr S.S. Co., 219 N.J. Super. 316, 323 (App. Div. 1987) (explaining that in a malicious prosecution suit, malice may be inferred from a lack of probable cause).  Because there are questions of fact as to probable cause and the malice inquiry is commingled with the probable cause analysis, summary judgment is denied.

### e. Hartman's Unlawful Entry Claim

For the same reasons detailed above as to Hartman's claim of illegal search and seizure, summary judgment is denied as to Hartman's claim for unlawful entry.  There is a genuine issue of fact related to whether the community caretaking exception to the Fourth Amendment's warrant requirement permitted, under the circumstances, entry into Hartman's home on April 9, 2010.

In addition, the Court rejects Defendants bald statement in their brief which contends that the Fourteenth Amendment's "shocks the conscious" standard applies to the entry because the officers were performing a "wellbeing check in response to information received from Sadowski." Def. Opp. Br., 7.  As previously explained, there is a genuine issue of material fact as to the reasons underscoring the entry into Hartman's residence, as they evolved over the course of the incident, and as to whether or not Hartman's "well-being" was genuinely of concern.  Given that the factual disputes, it cannot be determined at this time whether there was in fact a seizure and whether the claim must be analyzed under the Fourth or Fourteenth Amendments.  Summary judgment is denied.

### f. Qualified Immunity as to the Malicious Prosecution, Unlawful Arrest, and Seizure claims

Defendants are not entitled to qualified immunity at this time as to all of the Fourth Amendment claims.  As previously discussed, the subjective motivation of the officers is irrelevant under the objective standard required for a qualified immunity analysis of the claims. Blaylock v. City of Philadelphia, 504 F.3d 405, 411 (3d Cir. 2007).  Rather, the inquiry is whether a reasonable officer could have believed that probable cause existed to arrest, prosecute, and seize Plaintiff in light of clearly established law and the information the officers possessed. Id. (citation omitted).  Because there are questions of fact related to the nature of the information that the officers possessed and the circumstances which they confronted— resolution of which directly determines whether Defendants violated Plaintiff's constitutional rights and whether Defendants acted objectively reasonably even if Plaintiff's rights were violated— Defendants are not entitled to qualified immunity at this time. As a result, summary judgment is denied.

### g. Hartman's Claims for Failure to Intervene and Conspiracy

To make out a prima facie case of failure to intervene, a plaintiff must prove that an officer had a duty to intervene, the officer had a realistic and reasonable opportunity to intervene, and that the officer failed to intervene. Smith v. Mensinger, 293 F.3d 641, 650–51 (3d Cir. 2002). "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) (citations omitted). The inquiry is whether the officer was in a position to see the violation and had a reasonable amount of time to intervene. Id. at

1007 (instructing the district court upon remand to determine whether the officer was in a position to intervene).

Here, there are questions of fact that preclude summary judgment on this claim. As a result, summary judgment is denied on Count II.

In order to prevail on a conspiracy claim under §§ 1983 and 1985 a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right. <u>Ridgewood Bd. Of Educ. v. N.E. ex re. M.E.</u>, 172 F.3d 238, 254 (3d Cir. 1999). Given that Hartman did not challenge this claim in the briefing, summary judgment as to Count III of the Complaint for conspiracy is granted as to all of the Defendants. Fed. R. Civ. P. 56(e)(2) & (3).

### B. Municipal Liability

Defendants' motion for summary judgment is denied as to municipal liability. A municipality is not liable under 42 U.S.C. § 1983 on a respondeat superior theory. <u>Monell v. Dept. Soc. Servs. of New York</u>, 436 U.S. 658, 691 (1978). However, a government entity may be liable for its agent's actions upon a demonstration that a policy or custom of the municipality caused, or was a "moving force" behind, the alleged violation of Plaintiff's rights. <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) (quoting <u>Polk County v. Dodson</u>, 454 U.S. 312, 326 (1981)); <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996). A plaintiff must show that the municipality acted with "deliberate indifference" to the known policy or custom. <u>Canton v. Harris</u>, 489 U.S. 378, 388 (1989). "A showing of simple or even heightened negligence will not suffice." <u>Board of County Comm'rs of Bryan County, Okl. v. Brown</u>, 520 U.S. at 397, 407 (1997).

Here, Gloucester Township has a policy on procedures for responding to

abandoned 911 calls.  Policy or custom may be established in two ways. "Policy is made when a 'decision maker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Id. (citations omitted). Custom requires proof of knowledge and acquiescence by the decision maker. McTernan v. City of York, PA, 564 F.3d 636, 657 -658 (3d Cir. 2009). Moreover, supervisors can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," or if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010) (citations omitted).  Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).

Hartman also alleges failure to train as the basis of his Monell claim.  "[F]ailure to train reflects deliberate indifference to constitutional rights." Canton, 489 U.S. at 388, 392; see Brown v. Muhlenberg Twp., 269 F.3d 205, 215 (3d Cir. 2001) (holding that a failure-to-train claim must reflect a deliberate or conscious choice by a municipality as defined in Supreme Court cases). "[I]n order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation

involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (citations and footnote omitted).

Further, the United States Supreme Court has held that "neither a State nor its officials acting under their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). As such, an employee of the state named as a defendant in a civil rights action may be held liable only if that person has personal involvement in the alleged wrongs and is sued in their personal capacity. See Hafer v. Melo, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

Here, there are questions of fact related to whether Gloucester Township had a policy or custom which directly caused Hartman's constitutional harm or if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." Santiago, 629 F.3d at 129. Police officers Belcher, Bullock and Ritz all agree that Hartman's refusal to let the police enter was reason enough to justify warrantless entry into the home. See Belcher Dep., 54:7, Bullock Dep., 31:11, Ritz Dep., 70:1. Belcher further testified that he knew he was going to enter Hartman's residence after Hartman denied him entry because it was "pretty much understood" and "it's happened in the past." See Belcher Dep., 75:3-15. Although Police Chief Earle questioned the context of Belcher's, Ritz' and Bollock's claim that entry of a residence is justified upon the owner's refusal to permit entry, on summary judgment the Court's function is not to evaluate the evidence or determine the truth of the matter. Thus, even though Chief Earle testified

29

that the officers' statements may be interpreted differently because of the context of the questions posed, the Court cannot weigh the evidence or make credibility determinations and finds that there is a genuine issue of fact for the jury as to whether there is a policy or custom of illegal entry on abandoned 911 calls in Gloucester Township.

Likewise, summary judgment is denied under a failure to train theory. Prior to April 2010, none of the police officers could recall training for abandoned 911 calls outside of the police academy. And Chief Earle agreed that no training has been offered.

> Q. Would it surprise you that three of them testified that the last time they had received 911 call, accidental call training was when they got out of the police academy and were doing their original field training?
> A. No.
> . . .
> Q. Are you aware of any department wide trainings on the 911 accidental call policy at any point during 2010 or in the years preceding that?
> A. Department wide, no. The only other training issues I can speak of were the prosecutor's office there was some bulletins that would have some information regarding that, and certainly the supervisors attend a number of in-service trainings, I can't say what Officer bullock would have testified to, but there is a difference between what the supervisors may receive in training, they attend monthly meetings, versus what the officers may train.
> So there is a difference between supervisors and patrol officers, but a department wide training specifically on 911 hang ups in 2008, 2009 I couldn't say.

Earle Dep. 42:11-43:23.

Defendants brief is replete with conclusory statements and fails to account for the testimony of the officers as identified above. Construing all reasonable inferences in favor of Hartman, a jury could conclude that the Defendants' violation of Hartman's rights was a predictable consequence of Defendants' failure to properly train its officers. Accordingly, this Court finds that there are genuine issues of material fact relating to

Plaintiff's claim for unlawful custom, practice, policy/inadequate training.  Therefore, the Defendants Gloucester Township's motion for summary judgment will be denied.

## V. Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment is denied in part and granted in part. Summary judgment is granted as to Defendant Gloucester Township Police Department and as to Count III, and denied as to Defendants Gloucester Township, Ernest Basile, David Belcher, John Bullock, Joseph Kaighn, Timothy Kohlmeyer, Thomas Ritz, and John Stollsteimer.  In addition, Plaintiff's motion for partial summary judgment is denied.

An appropriate Order shall issue.

Dated: June 19, 2014

s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge